UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| | : | |
| **BRUCE BRYEN,** | : | |
| | : | |
| Debtor | : | Bky. No. 04-10868ELF |
| | : | |
| **BRUCE BRYEN,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| Defendant | : | Adv. No. 08-012 |
| | : | |
| | : | |

# O P I N I O N

## I. <u>INTRODUCTION</u>

In 2004, Bruce Bryen ("the Debtor") filed a chapter 7 bankruptcy case. In his bankruptcy

schedules, the Debtor listed a $19 million general unsecured debt for unpaid taxes ("the Tax

Debt") owed to the Internal Revenue Service ("the IRS").[1] This large tax liability was based

---

[1]    As the caption indicates, the technically proper designation of the creditor is "the United
States of America." The Debtor initially named the "IRS" as the defendant in his adversary complaint.
However, on March 19, 2008, the parties filed a stipulation seeking to amend the caption of the adversary
proceeding to name the United States of America ("the United States") as the proper defendant. (<u>See</u>
Adv. Docket Entry No. 9). The court approved the parties' stipulation on March 24, 2009. (<u>See</u> Adv.
Docket Entry No. 11). In this Opinion, consistent with common usage in litigation involving the Internal
Revenue Service, I will refer to Defendant United States of America as "the IRS."

upon the Debtor's unsuccessful efforts to employ various "tax shelters" in the tax years 1978,

1980, 1982 through 1989.

While the bankruptcy case was open in 2004, neither the Debtor nor the IRS requested a

determination regarding the dischargeability of the Tax Debt. In September 2004, the Debtor

received a general discharge of his debts and the bankruptcy case was closed a few days later. It

appears that the Debtor then assumed that the Tax Debt had been discharged. It turns out that the

IRS thought otherwise.

In 2007, the IRS instigated collection activity with respect to the Tax Debt. The IRS'

justification for doing so was that, in its view, the Tax Debt had not been discharged in 2004

because, prior to the commencement of his bankruptcy case, the Debtor had willfully attempted

to evade or defeat his tax obligations. See 11 U.S.C. §523(a)(1)(C).[2] The Debtor responded by

filing a motion in this court to reopen his bankruptcy case so that he could initiate an adversary

proceeding to obtain a determination of the dischargeability of the Tax Debt. The court granted

the Debtor's request and the Debtor commenced this adversary proceeding.

Quite simply, the Debtor contends that the Tax Debt was discharged in 2004. The IRS

contends that the unpaid taxes were not discharged.

For the reasons discussed below, I agree with the IRS and find the Tax Debt

nondischargeable. I will enter judgment in favor of the IRS and against the Debtor.

---

[2]       Generally speaking (and at the risk of greatly oversimplifying), §523(a)(1)(A), (B) and
§507(a)(8), read together, render nondischargeable taxes for which a return was due less than three (3)
years before the bankruptcy filing or taxes for which a return was actually filed less than two (2) years
before the bankruptcy filing. At no time has the IRS asserted that the Tax Debt is nondischargeable
under §523(a)(1)(A) or (B). The sole issue in this proceeding is whether the Tax Debt is
nondischargeable under §523(a)(1)(C).

## II. BACKGROUND

The Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on

January 21, 2004. (See Bankr. Docket Entry No. 1). In his bankruptcy schedules,[3] the Debtor

disclosed assets worth $364,300.00 of which $350,000.00 was attributed to a pension.

(See Bankr. Docket Entry No. 1, Sch. B). He disclosed no secured debt and general unsecured

debts of $23,276,069.39. (See Bankr. Docket Entry No. 1, Sch. D, F). The Debtor stated in his

schedules that $19 million of the $23.3 million in scheduled debt was owed to the IRS for the tax

years 1978, 1980 and 1982 through 1989.[4] (See Bankr. Docket Entry No. 1, Sch. F). The IRS

was, by far, his single largest creditor.[5]

On February 19, 2004, the Chapter 7 Trustee filed a No Asset Report. The court granted

the Debtor a discharge pursuant to 11 U.S.C. §727 on September 9, 2004. (See Bankr. Docket

Entry No. 27). The Debtor's bankruptcy case was closed on September 13, 2004. At no time

during the pendency of the bankruptcy case did the IRS or the Debtor file a complaint to

determine the dischargeability of the Tax Debt.

---

[3]       I may take judicial notice of the content of documents filed in the case for the purpose of
ascertaining the timing and status of events in the case and facts not reasonably in dispute. See Fed. R.
Evid. 201 (applicable by virtue of Fed. R. Bankr. P. 9017); In re Scholl, 1998 WL 546607, at *1 n. 1
(Bankr. E.D. Pa., Aug. 26, 1998); see also In re Indian Palm Assoc., Ltd., 61 F.3d 197, 205 (3d Cir.
1995). In this proceeding, I will take judicial notice of the Debtor's bankruptcy schedules.

[4]       At trial in this nondischargeability proceeding, the parties did not include 1978 among
the tax years at issue.

[5]       Other large debts the Debtor disclosed in Schedule F were: (a) $2.2 million owed to
Federal Financial Co., (b) $1.4 million to the New Jersey Mortgage Finance Agency; (c) $240,000.00 to
John Tordini and (d) $230,000.00 to the Estate of Dominick Garofalo. (See Bankr. Docket Entry No. 1,
Sch. F). The debt to the Estate of Dominick Garofalo will be discussed later in this Opinion.

3

On November 5, 2007, nearly three years after the bankruptcy case was closed, the Debtor

filed a motion to reopen his bankruptcy case to file the present adversary proceeding. (See

Bankr. Docket Entry No. 31).  The court granted the Debtor's motion to reopen his bankruptcy

case on January 9, 2008.[6]  (See Bankr. Docket Entry No. 39).

On January 15, 2008, the Debtor filed an Adversary Complaint seeking a determination

that the Tax Debt was dischargeable.  (See Adv. Docket Entry No. 1).  On February 19, 2008, the

IRS filed an Answer denying that the debt was dischargeable.  (See Adv. Docket Entry No. 4).

Trial of this adversary proceeding was held on March 13 and 16, 2009.[7]  Three (3) witnesses

testified:  Catherine Staskin ("Staskin"), a "bankruptcy specialist" employed with the IRS, the

---

[6]    In a chapter 7 case, neither the Bankruptcy Code nor the Federal Rules of Bankruptcy
Procedure impose any deadline for the debtor or a creditor to initiate a proceeding seeking a
determination of the dischargeability of a debt, except for proceedings involving debts asserted to be
nondischargeable under 11 U.S.C. §523(a)(2), (4) or (6).  The latter proceedings must be initiated during
the bankruptcy case, within sixty (60) days after the first date set for the meeting of creditors.  See Fed.
R. Bankr. P. 4007(b), (c).

Because a proceeding to determine the dischargeability of a debt under §523(a)(1) is not
subject to Rule 4007(c)'s sixty (60) day deadline, such a proceeding may be initiated while the
bankruptcy case remains open or after the bankruptcy case has been closed.  If the dischargeability issue
is not raised during the bankruptcy case, it may be determined in a state court or other non-bankruptcy
forum in an action the debtor or creditor initiates after the automatic stay has terminated.  Non-
bankruptcy fora are said to have "concurrent jurisdiction" to determine the dischargeability of debts in
proceedings that are not subject to Rule 4007(c).  See Alan N. Resnick & Henry J. Sommer (eds.), 4
Collier on Bankruptcy ¶523.04, at 523-17 (16th ed. 2010) ("Collier").  "A party may also move to reopen
the bankruptcy case for the purpose of filing a complaint to determine dischargeability, and bankruptcy
courts may exercise their jurisdiction to determine the dischargeability issues, or, alternatively, decline to
reopen the case."  Id.

In this instance, I exercised my discretion to reopen the case and exercise my jurisdiction
to determine the dischargeability of the Tax Debt.  See 28 U.S.C. §1334.  This is a core proceeding.  See
28 U.S.C. §157(b)(2)(I).

[7]    I will refer to the Notes of Testimony from March 13, 2009 as "1 N.T." and from March
16, 2009 as "2 N.T."

Debtor and Carolyn Walter (the Debtor's current wife).  Numerous documents were admitted

into evidence at trial.  Additionally, the parties identified certain undisputed facts in their Joint

Pretrial Statement ("Jt. Pretrial Stmt.").  (See Adv. Docket Entry No. 55).

Following the trial, I took the case under advisement and provided the parties an

opportunity to file post-trial memoranda.  Post-trial briefing was completed on July 22, 2009.

## III. FINDINGS OF FACT

Based on careful consideration of the trial record, my assessment of the credibility of the

testifying witnesses and the arguments and post-trial submissions made by counsel, I make the

following findings of fact:

### A. The Debtor's Accounting Practice and Tax Shelters

1. The Debtor has been a licensed Certified Public Accountant for approximately 35 years.  (1

   N.T. at 71).

2. In the 1970s, at the beginning of his career, the Debtor did some general accounting and tax

   return work.  (2 N.T. at 103-05).  By the late 1970's, the Debtor had stopped doing this kind

   of work.  (2 N.T. at 105).

3. By the early 1980's, the Debtor was working for an accounting firm that he co-owned with

   his father, Fred Bryen.  The firm was called Bryen & Bryen, PA.  (1 N.T. at 80; 2 N.T. at

   100).  At the time, the Debtor held a 50% interest in that entity.[8]  (1 N.T. at 80; 2 N.T. at 85;

------

[8]    In the mid-1980's, Marion Hunt ("Hunt") joined the Debtor and Fred Bryen at the firm
(continued...)

5

Jt. Pretrial Stmt. Fact ¶9).

4.  At Bryen & Bryen, PA, the Debtor's duties primarily consisted of bringing in clients to the firm and assisting clients with securing financing. (2 N.T. at 88, 103-104).

5.  In the late 1970's and early 1980's, Fred Bryen formed and promoted tax shelters involving investments in "employee leasing" partnerships. (Jt. Pretrial Stmt. Fact ¶10; 2 N.T. at 67-68).

6.  Bryen & Bryen, PA recommended these investments to its clients. The clients who made these investments compensated Bryen & Bryen, PA for the associated accounting services the firm provided. (2 N.T. at 87-88).

7.  The Debtor personally invested in these employee leasing partnerships for the tax years 1980 and 1982 through 1988. (Jt. Pretrial Stmt. Fact ¶14; Exs. 31, 32, 36 & 40; 1 N.T. at 88; 2 N.T. at 69).

8.  The Debtor filed tax returns and paid the tax due as reflected on each of the returns for the tax years 1980 and 1982 through 1988. (2 N.T. at 71). The Debtor reviewed, but did not prepare these tax returns. (2 N.T. at 105).

9.  The IRS issued notices of deficiencies to the Debtor disallowing his investments in the employee leasing partnerships for the tax years 1980 and 1982 through 1988. (See Jt.

---

[8](...continued)
and the firm became known as Bryen, Bryen & Hunt. (1 N.T. at 80; 2 N.T. at 101). At this point, the Debtor's ownership interest decreased to a one-third interest. (1 N.T. at 80; 2 N.T. at 101).

In approximately late 1999, a different entity, Bryen & Bryen, LLP, was organized. (2 N.T. at 101). When Bryen & Bryen LLP was formed, Fred Bryen was not active. (2 N.T. at 102). At that point, the Debtor and Hunt were partners in Bryen & Bryen LLP. (Id.) The Debtor and Hunt continue to be partners in Bryen & Bryen LLP at present. (1 N.T. at 73).

Pretrial Stmt. Fact ¶12).

10. The Debtor filed three (3) Tax Court petitions challenging the deficiencies. (See Jt. Pretrial Stmt. Fact ¶13; Exs. 30, 31, 33, 34, 37, 38 & 41; 1 N.T. at 88-89, 93-94; 2 N.T. at 69-72).[9]

11. The Debtor, along with several other investors, agreed that issues concerning the employee leasing partnership investments and related tax shelters should be tried in a single "test case." That test case resulted in a Tax Court decision reported as Bealor v. Commissioner, 72 T.C.M. (CCH) 730, 1996 WL 540109 (1996) ("Bealor" or "the Bealor Decision"). (See Exs. 32, 36, 40; 1 N.T. at 95; 2 N.T. at 72 & 94).

### B. The Bealor Decision and its Impact on the Debtor's Tax Liability and His State of Mind

12. In Bealor, the Tax Court considered the following "questions presented for decision . . . whether the transactions of the seven [(7) employee leasing] partnerships had (1) economic substance and (2) a profit objective." Bealor, 1996 WL 540109, at *9; (Jt. Pretrial Stmt Fact ¶15).

13. In 1996, the Tax Court issued its decision in Bealor. The Tax Court concluded that "the financial structure of the employee leasing partnerships . . . present[ed] only an image of genuine lending, borrowing, and investment transactions. The transactions were shams." Id. at *46 (emphasis added). (See also Ex. 47; 1 N.T. at 83-88).

---

[9]  The Debtor filed the first Tax Court petition on January 20, 1987 to challenge the IRS's notice of deficiency related to his 1979 and 1980 income tax liabilities. (See Ex. 31). The Debtor's second Tax Court petition was filed on July 13, 1989 and challenged the IRS's notice of deficiency related to his 1982 income tax liability. (See Ex. 34). The Debtor filed the third Tax Court petition on July 8, 1983 to challenge the IRS's notice of deficiency related to his 1983 through 1988 income tax liabilities. (See Ex. 38).

14. The <u>Bealor</u> court held that certain of the financing transactions had neither economic substance nor a profit objective. <u>Id.</u> at *59. Specifically, it found that the elaborate transactions underlying the employee leasing partnerships were "examples of the classic circle transactions that lack economic reality, to which we have refused to give effect." <u>Id.</u> at *42.

15. The Bealor Court further found that the petitioners would not receive taxable income from the transactions because they were shams. It concluded that "[t]he amounts received through the transactions . . . must therefore be subtracted from the taxable income reported by those partners for the years at issue, and their partnerships' taxable income thereby reduced." Id. at *61.

16. No party in interest appealed the <u>Bealor</u> Decision.

17. Once the <u>Bealor</u> Decision was final, the Debtor knew that he would be subject to additional tax liability and that the IRS would send him notice of the amount the IRS believed that he owed. While the Debtor knew that he also would be subject to interest and penalties, he did not know, at that time, the precise amount of additional tax that ultimately would be assessed. (2 N.T. at 107-109).[10]

18. The <u>Bealor</u> Decision did not result in any additional personal tax liability for the Debtor other than that related to the Debtor's investments in employee leasing partnership investments and tax shelters for tax years 1980 and 1982 through 1988. <u>Id.</u>

---

[10]    The Debtor testified that, at that time, he did not anticipate that his liability would exceed $1 million because he expected that his additional tax liability, including interest and penalties, would be offset by credits resulting from the reversal of the income previously reported. (2 N.T. at 107-108).

**C. Post-<u>Bealor</u> Negotiations and Settlement of the Debtor's Tax Liability,
the Debtor's Non-payment of His Tax Debt and the IRS' Assessment of
Penalties and Interest**

19. For approximately five (5) years after the <u>Bealor</u> Decision was issued in 1996, the Debtor

did not receive any communication from the IRS regarding the specific amount of his

additional tax liability. (2 N.T. at 109).

20. In the Spring/Summer of 2001, the IRS contacted the Debtor and began negotiating the

amount of his outstanding tax liability with him. His accounting firm partner, Hunt, assisted

him in those negotiations. (2 N.T. at 72 & 109-110).

21. These negotiations were not limited to the additional tax liability the Debtor faced as a result

of the <u>Bealor</u> Decision. They also encompassed tax issues relating to the Debtor's

"professional corporation."[11] (2 N.T. at 112).

22. On June 27, 2002, the parties' negotiations culminated in the Debtor signing three (3)

stipulations with the IRS ("the 2002 IRS Stipulations"). (<u>See</u> Exs. 33, 37 & 41; 1 N.T. at

93; 2 N.T. at 114). All three (3) stipulations stated that the Debtor owed taxes due to

substantial underpayment attributable to tax motivated transactions. (Exs. 33, 37 & 41).

23. By the time the Debtor signed the 2002 IRS Stipulations, he fully understood the magnitude

of his outstanding tax liability. (1 N.T. at 94-95, 164).

24. The 2002 IRS Stipulations set forth the Debtor's tax deficiency for the tax years 1980 and

---

[11]     The Debtor explained that his "professional corporation" had guaranteed some loans in a
business investment and that the business filed for bankruptcy. The Debtor's corporation had to make
payments on those loans for about seven (7) or eight (8) years and the IRS treated those payments as if
they were income to the Debtor. (2 N.T. at 112). The Debtor did not identify the specific corporation to
which he was referring. Therefore, I do not know if this was an entity related to his accounting practice
or some other separate business venture. For purposes of my decision, such detail is unnecessary.

1982 to 1988 as follows:

| Year | Deficiency Income Tax | Additions to the Tax-I.R.C. | | Total |
|------|------------------------|----------|----------|-------|
| | | §6653(a)(1)/(A) | §6661 | |
| 1980 | $ 25,522.00 | $ - | $ - | $25,522.00 |
| 1982 | $ 52,822.00 | $ 2,641.00 | $ 13,206.00 | $68,669.00 |
| 1983 | $ 29,145.00 | $ 1,457.00 | $ 7,286.00 | $37,888.00 |
| 1984 | $ 120,212.00 | $ 6,011.00 | $ 30,053.00 | $156,276.00 |
| 1985 | $ 261,938.00 | $ 13,097.00 | $ 65,485.00 | $340,520.00 |
| 1986 | $ 525,596.00 | $ 26,280.00 | $ 131,399.00 | $683,275.00 |
| 1987 | $ 1,125,439.00 | $ 56,272.00 | $ 281,360.00 | $1,463,071.00 |
| 1988 | $ 25,556.00 | $ 1,278.00 | $ 6,389.00 | $33,223.00 |
| TOTAL | $ 2,166,230.00 | $ 107,036.00 | $ 535,178.00 | $2,808,444.00 |

(See Ex. 33, 37 & 41).[12]

25. The IRS signed the 2002 IRS Stipulations on November 29, 2002. (See Exs. 33, 37 & 41; 2 N.T. at 114).[13]

26. Subsequently, the 2002 IRS Stipulations were entered as Decisions of the Tax Court. (See Exs. 33, 37 & 41).

27. The Debtor has never made any payments toward his outstanding tax liability. (1 N.T. at 171; 2 N.T. at 97).

28. On April 22 and 29, 2003, the IRS assessed the Debtor for each of the tax years at issue and the Debtor received a notice of each assessment as follows:

---

[12]    The chart above is a summary of Exhibits 33, 37 and 41. There was no deficiency in income tax due for the taxable year 1979.

[13]    At the time he signed the 2002 IRS Stipulations, the Debtor was advised by his attorney that the stipulations would not constitute final agreements until the government signed them. (2 N.T. at 114).

| Assessment Date | Tax Year | Tax Deficiency | Interest | Penalty | Total |
|---|---|---|---|---|---|
| April 22, 2003 | 1980 | $    25,522.00 | $    266,593.20 | $         - | $    292,115.20 |
| April 29, 2003 | 1982 | $    52,822.00 | $    467,816.73 | $    13,206.00 | $    533,844.73 |
| April 29, 2003 | 1983 | $    29,145.00 | $    224,653.72 | $    7,286.00 | $    261,084.72 |
| April 29, 2003 | 1984 | $   120,212.00 | $    803,077.21 | $    30,053.00 | $    953,342.21 |
| April 29, 2003 | 1985 | $   261,938.00 | $  1,496,534.17 | $    65,485.00 | $  1,823,957.17 |
| April 29, 2003 | 1986 | $   525,596.00 | $  2,629,636.05 | $   131,399.00 | $  3,286,631.05 |
| April 29, 2003 | 1987 | $ 1,125,439.00 | $  4,869,216.04 | $   281,630.00 | $  6,276,285.04 |
| April 29, 2003 | 1988 | $    25,556.00 | $     96,919.70 | $    6,389.00 | $    128,864.70 |
| Total | | $ 2,166,230.00 | $ 10,854,446.82 | $   535,448.00 | $ 13,556,124.82 |

(Exs. 48-55; 2 N.T. at 75, 97).[14]

29. When the Debtor received the April 22 and 29, 2003 assessment notices, he understood each

assessment to reflect the amount he owed the IRS.[15]  (Exs. 48-55; 2 N.T. at 75 ).

30. The Debtor understood that the notices of assessment requested payment of the taxes. (2

N.T. at 97-98).

31. A "Fourth Notice" for each year's tax liability was sent to the Debtor by June 16, 2003.[16]

---

[14]        The chart above is a summary of Exhibits 48-55.  Staskin, a bankruptcy specialist
with the IRS for twenty-one years, explained that prior to the date of the assessment, there is no specific
amount of liability on the IRS's books to collect. The date of assessment is the date the tax actually was
inputted into the computer system. (1 N.T. at 53-54).

[15]        A first notice is automatically generated and sent to the taxpayer when the IRS first
enters the assessment into the computer system. (1 N.T. at 54).

[16]        Staskin explained that the IRS can send a total of four notices to a taxpayer.  (1 N.T.
at 33).  Typically, the IRS will send a second notice if there has been no response from the taxpayer
within ten (10) to fifteen (15) days after the first notice was issued.  (1 N.T. at 58).  The IRS will send a
third notice thirty (30) days after the second notice.  (1 N.T. at 58).   If a second and/or third notice is
issued, it is generally reflected on the IRS's transcript for the taxpayer. (1 N.T. at 33, 35).  The fourth

(continued...)

32. In January 2004, a "correctional officer" from the IRS called the Debtor and the Debtor told

the caller that he was in the process of filing a bankruptcy petition. (2 N.T. at 75-76).

### D. The Debtor's Financial Affairs and Lifestyle

### 1. The Debtor's income

33. For the years 1996 through 2001, the Debtor earned an income of at least $62,700.[17] (Ex.

_____

[16](...continued)
notice is the final demand for payment and a request that the taxpayer contact the IRS regarding payment
options. It also advises the taxpayer of the possible consequences for not responding, such as a lien or
levy. (1 N.T. at 56-57). The fourth notice issues if there has been no response to the third notice within a
twenty (20) to thirty (30) day time period. (1 N.T. at 58).

The IRS' transcripts indicate that a fourth notice was sent to the Debtor for the tax years
1980 and 1982 through 1988 on either June 9, 2003 or June 16, 2003. (Exs. 48-55). However, the
Debtor claimed that he never received a second, third or fourth notice. (2 N.T. at 115). Instead, the
Debtor claims that the first time he heard from the IRS after the April 2003 assessment was in the middle
of January 2004, approximately one (1) week prior to the filing of his bankruptcy petition. (2 N.T. at 75-
76, 115).

Staskin acknowledged that the IRS transcripts show no evidence of a second or third
notice being sent to the Debtor. (1 N.T. at 55). Staskin provided a possible explanation for this
omission. She suggested that, perhaps, the IRS expedited issuance of the Fourth Notice because there
was an agreed-upon assessment for Bryen. (1 N.T. at 57, 59-60). This theory finds support in the fact
that the IRS transcripts reported that the fourth notice was sent to Bryen five (5) weeks after the April
2003 Assessment, which is faster than the normal process for sending out all four notices. Staskin also
said that if the IRS has been in contact with the taxpayer, and they are trying to work out an agreement
for payment, there would be no need for a fourth notice. (1 N.T. at 57-62).

I credit Staskin's testimony. I find it likely that the IRS streamlined the "notice process"
for the Debtor's tax account. He received a first notice in April 2003 at the time of the first assessment
and then a final, fourth notice approximately five (5) weeks later in June 2003. Given that the IRS began
negotiations with the Debtor a year and a half prior and already agreed upon his tax liability by 2002, it is
more likely the IRS chose to shorten the collection process and went straight to a fourth notice.

[17]    The Debtor attempted to prove that his adjusted gross income for 1996 through 2003 was
negative, i.e., that he lost money. For example, the Debtor's 1996 tax return disclosed an adjusted gross
income of <u>negative</u> $413,124.00, (1 N.T. at 48-49), a figure that was not challenged by the IRS. The
(continued...)

131 at 66-75).

34. In 2001 the Debtor earned an income of at least $80,000.00. (Ex. 131 at 76).

35. In 2002, the Debtor had "good year" and earned an income of approximately $190,000.00.

   (1 N.T. at 141).

36. In 2003, the Debtor earned an income of at least $87,000.00. (Ex. 131 at 80).

37. When the Debtor filed his bankruptcy petition in January 2004, he reported a monthly gross

   income of $10,417.00, which amounts to almost $125,000.00 per year. (See Bankr. Docket

   Entry No. 1, Sch. I).

### 2. The Debtor's Relationship with Carolyn Walter and their Financial Arrangements for Paying Living Expenses

38. In 1993, the Debtor met Carolyn Walter ("Walter"). (1 N.T. at 68; 2 N.T. at 6; Jt. Pretrial

   Stmt. Fact ¶17). Walter holds a doctorate degree in social work and is a college professor.

   (2 N.T. at 5).

39. In late 1994, the Debtor and Walter began living together at Walter's three (3) bedroom

---

[17](...continued)
Debtor filed tax returns with a negative adjusted gross income for the years 1997 through 2003. (Id. at 49-52).

   To the extent the Debtor hoped to prove that large deductions/losses resulted in him demonstrated that he was in difficult financial circumstances with little personal cash flow between 1996 and 2003(and therefore, that he lacked the requisite intent to evade or defeat the Tax Debt), he simply did not sufficiently develop the record. As set forth in Findings of Fact Nos. 33-37, the Debtor had substantial earned income, in the years after the Bealor decision (albeit varying over that time period). Based on his income level, as well as the evidence relating to his lifestyle (detailed later in this Opinion), I conclude that the Debtor did not lack for cash from year to year. Therefore, I cannot give weight to his implied argument that his tax "losses" excused him from his making payments toward his tax liability, particularly in the years from 2001 through 2003.

14

home located at 22 Mallard Mill Run Road in Wallingford, Pennsylvania ("the Mallard Mill

Run Residence"). (2 N.T. at 6; 1 N.T. at 69; Jt. Pretrial Stmt. Fact ¶17). The Debtor and

Walter lived in the Mallard Mill Run Residence until 2003. (1 N.T., 69).

40. Initially, Walter paid for all of the couple's expenses. (2 N.T. at 6).

41. In approximately 1997, the Debtor and Walter decided to split expenses and formalize the

division of those expenses. (Id.). Starting in 1997, the Debtor paid for fifty percent (50%)

of the expenses, property taxes, utilities, maintenance, and repair costs of the Mallard Mill

Run Residence. (2 N.T. at 6-7).

42. In 1997, Walter opened a checking account in her name at PNC Bank to be used to pay the

couple's joint expenses. (Id.).

43. At the time Walter opened the PNC Bank account, the Debtor stopped using a checking

account to avoid the risk of having it attached by one of his creditors.[18]   (1 N.T. at 104-108;

2 N.T. at 81-83).

44. Both the Debtor and Ms. Walter funded the PNC Bank account. The Debtor made cash

_____

[18]     The Debtor attributed part of the cause of his lack of a personal checking account to the
Garafalo Estate, the same debt the Debtor scheduled as owed to "The Estate of Dominick Garafalo" for
$230,000.00 on Schedule F. In the late 1990's, the Debtor was embroiled in litigation concerned a loan
transaction between two parties whom the Debtor had introduced to each other; both were clients of his,
one of them being Dominick Garafolo). (2 N.T. at 77-78). At a certain point the borrower defaulted.
The lender (Garafalo) passed away and his estate sued the Debtor. (Id.). The Garafalo Estate obtained a
judgment against the Debtor and later attempted to enforce that judgment against the Debtor's assets.
(Id.). The record does not reveal precisely when the judgment was entered. Ultimately, an order was
entered in that proceeding requiring the Debtor to pay $1,750.00 a month for about twelve (12) years.
The Debtor started making payments required by the order starting in late 2002 or early 2003. In 2003,
the Debtor paid $25,000.00 on the judgment. (1 N.T. at 168 -169; 2 N.T. at 77-78, 98,115).

deposits[19] and deposited checks from Bryen & Bryen, LLP into the PNC Bank account to

pay for his half of the couple's bills. (1 N.T. at 114-115; 2 N.T. at 7).[20]  Walter would

transfer money from one of her other accounts, typically a money market account, into the

PNC Bank Account to pay her half of the expenses. (2 N.T. at 7).

45.    Each month, the Debtor and Walter reviewed their bills together and the Debtor would write

the necessary checks, which Walter would sign because the PNC Bank account was in her

name. (2 N.T. at 7; 1 N.T. at 114, 120-121).  On occasion, the Debtor would use Walter's

signature stamp. (1 N.T. at 120-21).

46.    At some point, Walter closed the PNC Bank account and opened a checking account with

Commerce Bank.  Again, only Walter's name was on the Commerce Bank account. (1 N.T.

at 115, 121, 152; 2 N.T. at 46).

47.    The Debtor and Walter used the Commerce Bank account to pay their joint bills in the same

way they had used the PNC Bank account.   (1 N.T. at 121-122).

48.    The Debtor typically paid his personal expenses (i.e., expenses that were not joint) directly

from the account of his business, Bryen & Bryen, LLP (1 N.T. at 110; see, e.g., Ex. 93).

49.    In 1996, Walter bought property in Rehoboth Beach on which she built a home ("the

---

[19]      From approximately the late 1990's to or through 2003, the Debtor regularly took his
paycheck to the bank and cashed it. (1 N.T. at 104).  Presumably, this was the source for the cash
deposits.

[20]      Both the Debtor and Walter acknowledged that any cash deposits made to the PNC Bank
Account and, later to the Commerce Bank Account, came from the Debtor. (1 N.T. at 115; 2 N.T. at 37-
38).

Rehoboth Beach House"). (2 N.T. at 9). Walter paid for the land and for the builder to

build the Rehoboth Beach House with her personal funds. (Id.) The Rehoboth Beach House

is in Walter's name only. (Id.).

50. Typically, Walter and the Debtor make trips to the Rehoboth Beach House during the

summer months, from June through the end of August. (2 N.T. at 10).

51. Since the house was built in 1996, the Debtor has paid for fifty percent (50%) of the

expenses related to the Rehoboth Beach House, including the utilities, insurance, property

taxes, maintenance and repair costs. (2 N.T. at 9-11).

52. Between 2001 and 2003, the Debtor and Walter jointly paid over $10,000.00 toward

maintenance and landscaping of the Rehoboth Beach House. (1 N.T. at 144; 2 N.T. at 42-

43, 46, 49; Exs. 95 & 97).

53. In 2001, the Debtor and Walter married. (1 N.T. at 68; 2 N.T. at 15; Jt. Pretrial Stmt. Fact

¶18). They spent approximately $5,000.00 on their wedding, equally splitting the cost. (2

N.T. at 35-36).

54. In 2003, the Debtor and Walter moved from the Mallard Mill Run Residence to a four (4)

bedroom townhome located at 502 Guinevere Drive in Newtown Square, Pennsylvania ("the

Guinevere Drive Residence"). (1 N.T. at 68, 165).

55. The Guinevere Drive Residence is held in Walter's name only. (2 N.T. at 8). The down

payment came from the proceeds of the sale of the Mallard Mill Run Residence. (Id.).

56. Since moving into the Guinevere Drive Residence, Walter and the Debtor have each paid

fifty percent (50%) of the monthly mortgage payments and all of the other expenses related

to the home, including property taxes, insurance, maintenance and repair costs. (1 N.T. at

165; 2 N.T. at 8-9).

57. In 2003, the Debtor and Walter paid over $11,000.00 to build a deck and for maintenance or

other enhancements for the Guinevere Residence. (2 N.T. at 53-54; Ex. 97 at 1271, 1307).

58. In late 2003 or early 2004, shortly before filing the bankruptcy case, the Debtor opened a

checking account in his name. (1 N.T. at 107-108).

59. In his bankruptcy schedules, the Debtor reported a monthly mortgage payment of $1,050.00.

(See Schedule J.)


### 3. The Debtor's Travel with Walter

60. The Debtor and Walter have taken at least one vacation together in the summer and one in

the winter every year since they met in 1993. (2 N.T. at 19).

61. In 2001, the year the Debtor and Walter were married, the Debtor incurred approximately

$25,000.00 in charges on one of his American Express cards for the couple's travel-related

expenses. Those expenses included the costs for airfare to and tours in Spain, Portugal, St.

John and an evening at the Four Seasons Hotel in Philadelphia, Pennsylvania. Other

expenses incurred that year were related to future trips to Costa Rica and St. Lucia. (1 N.T.

at 126, 129, 132; Ex. 90).

62. In 2002, the Debtor had approximately another $25,000.00 in charges on one of his

American Express cards for travel-related expenses for the couple. Those expenses included

the costs for airfare and tours in Costa Rica, Panama City, France and St. Lucia. Other

expenses incurred that year were related to a future three-week trip to Australia that cost

$13,260.00. (1 N.T. at 130-136; Ex. 90).

18

63. In 2003, the Debtor and Walter took their previously paid, three-week trip to Australia. They also made a partial payment of $2,200.00 toward a "Mediterranean Journey" for 2004. (1 N.T. at 124-125, 135; 2 N.T. at 25; Exs. 90 & 105).

64. Prior to 2004, the Debtor and Walter also traveled to Italy, Austria, Germany, Switzerland, Montauk, Mexico, Belize and Arizona.[21]  (2 N.T. at 20-23, 26-27, 30).

65. In 2004, the Debtor and Walter went to the Mediterranean.  The balance of the Mediterranean trip was paid by credit card on March 26, 2004, after Bryen filed the bankruptcy case.  The total cost of the trip, including the 2003 partial payment, was $7,980.00.  (Ex. 105 at 1680; 1 N.T. at 125).

66. The Debtor and Ms. Walter shared the expenses for their vacations equally.[22]  (Jt. Pretrial Stmt. Fact ¶20).

67. The American Express credit card used to pay for much of the joint travel expenses was paid in full each month with a check from Walter's PNC Account.  See (Ex. 91).

### 4.     The Debtor's Support of his Mother

68. Fred Bryen died in 2002 and left his wife, the Debtor's mother, with no assets or estate. (2 N.T. at 112-113).

---

[21]     The record does not account for the precise dates of all of these trips or how much they cost.

[22]     The Debtor suggests that his share of air travel was generally paid for with frequent flyer miles, thus implying that his share of the travel expenses was not extravagant. (1 N.T. at 135). There is ample evidence in the record to suggest otherwise – i.e., that both the Debtor's and Walter's flights were paid for by credit card. (See Ex. 90)

69. Since May 2001, the Debtor has been paying the rent for his mother's apartment in an

amount between $1,199.00 and $1,256.00 per month.  (1 N.T. at 163).

### 5.      The Debtor's Other Monthly Expenses

70. When the Debtor filed his bankruptcy case in 2004, he reported the following monthly

expenses: $500.00 for utilities; $300.00 for home maintenance; $650.00 for food; and

$500.00 for clothing. (See Sch. J).

71. The Debtor also allocated one-quarter of his gross monthly pay, $2,500.00 per month, for

recreation. (Id.).

### E.   The Debtor's Failure to Pay His Tax Liability

72. The Debtor filed his tax returns for each of the years at issue.  He also paid the reported tax

due at that time.

73. The Debtor has not made any payments on the Tax Debt since the Bealor decision in 1996.

## IV. DISCUSSION

### A. Legal Standard

#### 1. §523(a)(1)(C)

Section 523(a)(1)(C) excepts from discharge any debt for taxes "with respect to which

the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such

tax." 11 U.S.C. §523(a)(1)(C).  Section 523(a)(1)(C) is comprised of two disjunctive provisions,

one involving fraudulent tax returns and the other involving "willful evasion" of a tax debt.  See

In re Scarpiello, 240 B.R. 203, 208 (Bankr. E.D. Pa. 1999).  In the instant matter, the IRS

contends that the debt the Debtor owes to the IRS should be excepted from discharge under the

second part of the discharge exception, i.e.,"willful evasion."

As is true with respect to most other §523(a) discharge exceptions, §523(a)(1)(C) is strictly

construed in favor of the debtor.  In re Fegeley, 118 F.3d 979, 983 (3d Cir. 1997) (citing Dalton

v. I.R.S., 77 F.3d. 1297, 1300 (10th Cir. 1996)). At the same time, however, as the Court of

Appeals observed in Fegeley, §523(a)(1)(C) is drafted in broad terms.  Conduct that "in any

manner" constitutes an attempt to evade or defeat a tax renders the tax debt nondischargeable.

See 118 F.3d at 983.

The IRS bears the burden of proof on the issue of dischargeability, even though the

Debtor is the plaintiff in this proceeding.  Id.  The IRS must prove by a preponderance of the

evidence that the Debtor willfully attempted in any manner to defeat or evade his taxes.  Id.

(citing Grogan v. Garner, 498 U.S. 279, 291 (1991)).


### 2. Fegeley

Fegeley is the seminal case in this Circuit under §523(a)(1)(C).  It established the

analytical framework to be applied in nondischargeability proceedings under that provision.

The Fegeley court began its analysis by cautioning, as have many other courts, that a

debtor's failure to pay his taxes, by itself, does not render the tax debt nondischargeable under

§523(a)(1)(C).  Fegeley, 118 F.3d at 983.  Rather, the failure to pay is treated as relevant

evidence to be considered as part of the totality of the circumstances in evaluating whether a

debtor attempted to willfully evade or defeat a tax.  Id.

21

The <u>Fegeley</u> court held that the "willful evasion" clause of §523(a)(1)(C) requires proof

of two elements: (1) a conduct requirement (<u>i.e.</u>, the debtor must engage in some "conduct" that

constitutes an attempt to evade or defeat the tax); and (2) a scienter requirement (<u>i.e.</u>, the debtor's

mental state must be that he acted "willfully"). <u>Id.</u> at 983-84.

With respect to the "conduct" element, the <u>Fegeley</u> court held that both affirmative

conduct and culpable omission (like the knowing failure to file tax returns) may serve to satisfy

the requirement. <u>Id.</u> As for the scienter element, the court held that §523(a)(1)(C) employs what

it termed the "civil" (as opposed to the "criminal") test for "willfulness": <u>i.e.</u>, the debtor's

attempts to avoid his tax liability must be "voluntary, conscious, and intentional." <u>Id.</u> at 984

(internal quotations and citations omitted).[23]

---

[23]    <u>Fegeley</u> involved a 50- year-old salesman who had sufficient funds to pay his taxes, but
failed to do so.  After receiving communication from IRS agents, Fegeley filed the outstanding tax
returns.  The IRS did not assert that the tardy tax returns were fraudulent.  Nonetheless, the government
brought criminal charges against Fegeley for a willful failure to file his tax returns and he pled guilty to
those charges.  He later filed a bankruptcy case and received a discharge.  Much like this case, after the
IRS initiated post-discharge collection efforts, Fegeley and his wife reopened their bankruptcy case and
commenced an adversary proceeding to determine the dischargeability of his tax debt.  The bankruptcy
court held that the debt was dischargeable – specifically, that his failure to file income tax returns, in
connection with his failure to pay those taxes, even when he had the ability to pay, did not constitute an
attempt to willfully evade or defeat his tax liability. On appeal, the Court of Appeals reversed.  The court
applied the legal standards discussed above in the text and concluded that Fegeley's failure to file his tax
returns, when he knew he had the duty to do so and had sufficient funds to pay the taxes, met both
elements for nondischargeability due to "willful evasion" under §523(a)(1)(C).

Many other cases decided under §523(a)(1)(C) involve a debtor's failure to file tax returns. See,
e.g., In re Fretz, 244 F.3d 1323 (11th Cir. 2001); In re Eleazar, 271 B.R. 766 (Bankr. D.N.J. 2001); In re
Weiss, 237 B.R. 600 (Bankr. E.D. Pa.1999), aff'd in part, rev'd in part, 2000 WL 1708802 (E.D. Pa.
Nov. 15, 2000), aff'd, 276 F.3d 582 (3d Cir. 2001) (Table), amended & superceded by 32 Fed. Appx. 32
(3d Cir. Feb. 20, 2000) (Table).

I note that the conduct at issue in this matter differs materially from that in <u>Fegeley</u>.  This
case is not about a debtor's failure to file his tax returns.  Rather, this proceeding concerns the Debtor's
conduct during the time period after a determination was made that the <u>timely filed returns</u> contained
substantial deficiencies, as well his conduct after those deficiencies were assessed.  Thus, although the
(continued...)

### B. The Relevant Time Period to be Considered In Assessing the Debtor's Conduct and Scienter

The IRS argues that the Debtor's evasive conduct began after the <u>Bealor</u> Decision was issued in 1996.[24] (2 N.T. at 62-63). The IRS asks the court to closely examine the lifestyle the Debtor led in the period between <u>Bealor</u> and the bankruptcy filing and from that period up until he filed the bankruptcy case and suggests that it is indicative of willful evasion of his tax obligations. The Debtor's view is that the propriety of his conduct should be considered only for the time period after November 2002, when the IRS signed the 2002 IRS Stipulations because, prior to that date, he had no actual notice of the conclusive amount of the Tax Debt.

I agree with the IRS that the Debtor's conduct and state of mind in the entire post-<u>Bealor</u> period may be considered, but with some qualification.

The Debtor is correct when he points out that at the time the <u>Bealor</u> Decision was issued in 1996, he had no actual notice of the specific dollar amount he owed. Even so, I find it impossible to believe that, post-<u>Bealor</u>, the Debtor lacked notice that he was responsible for a <u>quite substantial</u> additional tax payment. At the same time, the fact that it took the IRS an inordinate amount of time after <u>Bealor</u> – about five years! – to contact the Debtor and commence the process of quantifying and assessing the Tax Debt, complicates my evaluation of

---

[23](...continued)
legal standards set forth in <u>Fegeley</u> are instructive – and indeed, binding on this court – the facts of <u>Fegeley</u> do not provide much assistance in analyzing how those standards should be applied in this case.

[24]       The IRS also argues that the Debtor's conduct in the 1980's – in particular, his participation in tax shelter transactions found to lack economic substance – supports a finding of willful evasion under §523(a)(1)(C). <u>See</u> IRS Mem. at 19-20. I do not reach the issue and do not rely on the findings in the <u>Bealor</u> decision. Rather, I base my findings solely on the Debtor's <u>post-Bealor</u> conduct, particularly after January 2001, and the inferences that I have drawn regarding his state of mind.

23

the Debtor's conduct and state of mind in the 1996-2001 time period.

Between 1996 and 2001, the Debtor was in something of a state of limbo. He knew that he faced that a huge tax liability, but the tax was unliquidated, unassessed and not subject to the IRS' enforcement remedies. During that time, the Debtor appears to have fallen off of the IRS' "radar screen." This state of affairs differs substantially from many §523(a)(1)(C) cases in which a debtor's conduct is evaluated after he or she fails to file tax returns at all or having done so, the amount of a tax debt has been determined and assessed. Nevertheless, the unliquidated, unassessed status of the Tax Debt does not render irrelevant everything that occurred in the post-Bealor/pre-assessment time period. If that were true, the failure to file tax returns (conduct that causes the taxes due to remain unliquidated and unassessed) could not support a finding of nondischargeability finding under §523(a)(1)(C) and, as Fegeley makes clear, that is not what the law provides. I conclude that the peculiar posture in which the Debtor found himself between 1996 and 2001 (after Bealor but before the commencement of the negotiations that resulted in the assessment of the Tax Debt) must be considered carefully and cautiously before any inferences or conclusions are drawn regarding the Debtor's conduct and scienter, but that evidence from that time period is relevant.

Finally, before applying these principles to the facts of the case, I emphasize that the Debtor's situation changed dramatically once the IRS contacted the Debtor in 2001 and particularly after he signed the Stipulations in June 2002. By then, the Debtor knew the specific magnitude of his tax liability. His conduct thereafter is especially relevant in assessing the two prongs of the test for nondischargeability under §523(a)(1)(C). Therefore, while I will consider the entire post-Bealor time period relevant in assessing the Debtor's conduct and state of mind, I

24

will concentrate my analysis on the period from January 2001 through January 2004.

### C. The Debtor's Tax Liability Is Not Dischargeable

#### 1. the Debtor's Conduct

The IRS asserts that the Debtor acted to evade the Tax Debt in at least two (2) ways: (1) by failing to make some payment on his taxes when he had the means to do so; and (2) by dealing in cash, paying debts through and in the name of others, and living a lavish lifestyle.[25] IRS Mem. at 21-23. I agree.[26]

Here, the Debtor earned significant income during the relevant years prior to filing his

---

[25]     The Debtor contends that the manner in which he may have "dealt in cash" cannot support a nondischargeability finding under §523(a)(1)C) case because there is no evidence, or any allegations for that matter, that the Debtor or his business ever improperly reported income. In other words, the IRS does not accuse the Debtor of dealing in cash in a way that is linked directly to a failure to report income. The Debtor also argues that the term "dealing in cash" has been used to address situations where the taxpayer hides or conceals assets from the government through use of cash transactions. The Debtor cites to In re Grow, 1997 WL 595088 (Bankr. S.D. Ala. May 30, 1997) as an example of a case involving a debtor who had neither a personal nor business checking account (the Debtor had one with Bryen & Bryen LLP) and the court found that such failure to maintain a checking account in his name was insufficient to prove nondischargeability under section 523(a)(1)(C).

     I am unpersuaded by this argument. Conduct rendering a tax debt nondischargeable is not limited to tactics employed to conceal unreported taxable income. "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation." Fegeley, 118 F.3d at 983 (internal quotations and citations omitted). Practices, such as "dealing in cash," may cause a debt to be nondischargeable under §523(a)(1)(C) if employed to evade payment even after the taxes have been reported and assessed. See In re Guben, 2008 WL 3875354, at *2 (Bankr. E.D. Pa. Aug. 14, 2008); In re Jacobs, 2006 WL 2691516, at *14 (M.D. Fla. Sept. 19, 2006), aff'd, 490 F.3d 913 (11th Cir. 2007); In re Klayman, 333 B.R. 695, 702-03 (Bankr. E.D. Pa. 2005).

[26]     To some extent, the discussion that follows in the text also involves the "mental state" element under §523(a)(1)(C). Determining whether there was tax evasion "conduct" tend to merge with the evaluation of a debtor's intentions to some extent and vice versa.